# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

RONALD G. EPLING,

-vs-                                            Case No.  6:03-cv-820-Orl-GJK

COMMISSIONER OF SOCIAL
SECURITY,

_____

## MEMORANDUM OF DECISION

On June 16, 2003, Plaintiff Ronald G. Epling ("Epling") appealed to the district court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits.  *See* Doc. No. 1 (the "Complaint").  For the reasons set forth below, the Commissioner's decision is **REVERSED and REMANDED under sentence four of 42 U.S.C. § 405(g) for a calculation of an award of benefits**.

## I.      BACKGROUND

This case has a long and somewhat tortured history.[1]  Epling was born on September 30, 1943. R. 58.  Epling was nearly fifty-two years of age when the first hearing in this case was held on August 17, 1995.  R. 32, 35.  Epling was sixty-three years old when the third hearing, which is

---

[1] For instance, the application for social security disability benefits in this case was filed on September 22, 1993.  R. 58.  From December 29, 1995 until June 8, 2007, there have been three hearings before different administrative law judges, and the Commissioner has lost parts of the administrative recorded, including the claims file and tape or transcript of a hearing held on February 15, 2001.  R. 12-19, 212-20, 224, 277-88; Doc. No. 9 at 2.  Epling's insurance status expired on December 31, 1987, and, therefore, any onset of disability must be shown prior to that date, some twenty-two years ago.  R. 212.

at issue in this case, was held on May 15, 2007. R. 221, 229. The decision under review is the June 8, 2007 decisions of Administrative Law Judge Stephen C. Calvarese (hereinafter "Calvarese" or "ALJ Calvarese"). Doc. No. 212-220.

Epling repeated the first, second, and seventh grades and his education concluded sometime around the eighth grade. R. 328-29. Epling cannot read or write, but can perform simple arithmetic. R. 15-16, 154, 230, 250, 279, 328-29.[2] Epling has prior employment experience as a garbage truck driver from 1964 through 1968, tow truck driver from 1969 through 1973, and then he worked as a heavy equipment operator for MJ Stavola Industries from 1974 through June of 1982 when he injured his back after falling from a piece of heavy machinery. R. 89, 231-32.

Epling first applied for disability benefits in April of 1983, but the claim was denied initially, upon reconsideration, and by a decision of an administrative law judge ("ALJ") on April 27, 1984. R. 12.[3] Epling did not seek review of the ALJ's decision in the district court. R. 12. Epling filed the present application for disability benefits on September 22, 1993. R. 58-61. In his application for disability insurance benefits, Epling states that his onset of disability occurred on November 4, 1987. R. 58. Epling's eligibility for disability insurance expired on December 31, 1987. R. 13, 278, 212. Therefore, at the administrative level below, Epling had the burden to

---

[2] In Administrative Law Judge Stephen C. Calvarese's ("Calvarese") June 8, 2007, decision, he states the following: "Despite the claimant's allegations of an inability to read or write and his diagnosis of low average intelligence, the evidence shows that he has worked performing jobs at a skilled level. This shows a level of adaptability for fairly complex job tasks despite his limited reading and arithmetic skills. Although the undersigned recognizes that the claimant has some degree of limitation, the objective and other evidence simply does not establish that the limitations are as disabling as the claimant alleges." R. 218. The Court does not find Calvarese's statement to be a factual determination that Epling can read or write because Calvarese's hypothetical question to the vocational expert was strictly limited to an individual who cannot read or write. R. 250. Furthermore, there is simply no evidence, whatsoever, in record to support any finding that Epling has the ability to read or write more that one or two words.
[3] The first application, denial, denial upon reconsideration, and decision of the ALJ are not part of this record, but they are mentioned in ALJ Ruben O. Figuerora's ("Figuerora") decision on December 29, 1995. R. 12.

establish his disability on or before December 31, 1987. Epling's application for disability is based on his back pain, specifically spondylolisthesis of L5-S1 vertebrae. R. 121, 214.[4]

**Dr. Faris**

On June 1, 1982, Epling began treatment with Dr. Wagdi F. Faris, an orthopaedic surgeon. R. 123-27.[5] On July 7, 1982, Epling presented to Dr. Faris with worsening pain of the lower back, radiating pain in the right leg, and muscle spasms in the lower back. R. 127. According to Dr. Faris, the prescribed medication was not helping and a different medication was prescribed. *Id.* Dr. Faris's treatment plan called for Epling's admission into the hospital for conservative treatment, including traction and physical therapy. R. 127. On August 2, 1982, Epling was experiencing some relief with the new medication, but continued to have localized pain in the lower back with tenderness and mild spasm. *Id.* Dr. Faris's notes from August 18, 1982 reflect the following:

> The patient continues with the localized low back pain with no radiation to the lower extremities, it's on the right side of the upper lumbar areas with tenderness, no specific tenderness in the lower lumbar or lumbosacral area. I was concerned about the high localization of the pain, and I took AP and lateral x-rays of the lumbar spine which showed only mild spondylolisthesis at L5, S1, no abnormality in the upper lumbar region. The patient developed headache with the traction and I advised him to stop all kinds of the traction and physical therapy and to go back to Dr. Haling for treatment. So far, the condition does not suggest herniated disc, and he should continue on conservative management, I don't believe traction at the hospital would do him any good. The patient was given a prescription for Fiorinal #3 for pain and headache.

---

[4] Spondylolisthesis is the "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebrae below it, or upon the sacrum." *Stedman's Medical Dictionary*, 26th Ed. (1995).

[5] In ALJ Calvarese's June 8, 2007 decision finding no disability, Epling's treatment with Dr. Faris is not mentioned although Dr. Faris's treatment of Epling is discussed in the prior decisions of ALJ Ruben Figueroa (December 29, 1995) and Apolo Garcia (2001). R. 12-19 (Figueroa), 212-20 (Calvarese), 277-88 (Garcia). Counsel for Epling also brought Dr. Faris's treatment records to the attention of ALJ Calvarese at the May 15, 2007 hearing, and Epling was questioned by counsel and the ALJ about Dr. Faris's treatment. R. 226, 234.

*Id.*[6]  On September 15, 1982, Dr. Faris's notes show that Epling was continuing to experience low back pain which caused him difficulty sleeping.  R. 126.  Dr. Faris found tenderness in the lower back, but stated that Epling walks without a limp and without radiation of pain.  *Id*.  Dr. Faris continued to recommend conservative treatment, and stated that Epling "is not anxious to have any surgery."  R. 126.  "Patient continues to be TTD, but I believe rehabilitation is recommended to get him back to another job that does not require excessive heavy lifting."  *Id.*[7]

On October 18, 1982, Epling presented to Dr. Faris with radiating pain in both legs and numbness along the back of both legs.  R. 126.  Dr. Faris stated that Epling's treatment with Dr. Haling "has helped a lot, continue on the same. . . ." *Id*.  On November 8, 1982, Epling reported that his condition was worsening.  *Id*.  Epling's straight leg test was positive on the right side and he was walking with a "stiff gait."  *Id*.  Dr. Faris's notes reveal that physical therapy did not help Epling's condition.  *Id*.  Epling agreed to undergo a myelography, which was scheduled for the following day.  *Id.*[8]  However, Epling called Dr. Faris on November 9, 1982, and reported that he was unsure about the procedure. R. 125.  Dr. Faris also had second thoughts about the procedure and his notes reflect the following:

> I am not sure if I want to do a myelogram on this patient.  I would rather refer him anywhere else where he can have his treatment and the myelogram, since, so far, I have not been able to help him.  In my opinion, with this attitude, the patient probably will develop a post-myelogram headache, and probably will be a very poor candidate for surgery if he does have a positive myelogram.

---

[6] The record on appeal contains no treatment records from Dr. Haling, but does contain a letter dated January 17, 1983, from a Dr. Robert G. Haling, a chiropractic physician, addressed to "Whom it May Concern."  R. 324.  The brief letter states that Epling achieved what appears to be maximum medical improvement ("MMI") on April 8, 1982. R. 324.

[7] Dr. Faris's notes do not define "TTD."   However, TTD commonly refers to a temporary total disability.

[8] A myelography is a "[r]adiography of the spinal cord and nerve roots after the injection of a contrast medium into the spinal subarachnoid space."  *Stedman's Medical Dictionary*, 26th Ed. (1995).

R. 125. On November 16, 1982, Epling decided to go forward with the myelogram. R. 125. On January 10, 1983, the results of the myelogram were negative, but showed a deep recess at the L5 level. R. 125. "He also has spondylolisthesis Grade I at the L5, S1 level." *Id*. Epling's straight leg test remained uncomfortable, and he continued complaining of radiating pain in both buttocks and legs. *Id*. Dr. Faris advised Epling that "some surgeons would fuse the lumbosacral spine because of the spondylolisthesis, <u>but I am not sure if that will give him any relief from his condition</u>." R. 125 (emphasis added).

Epling did not return to Dr. Faris until August 17, 1983. R. 124.[9] Epling's low back pain continued and he stated that his right leg would occasionally give out. R. 124. Upon examination, muscle spasms were present and straight leg testing was positive. R. 124. A spinal fusion was again discussed, but Epling stated that he was afraid of the surgical procedure. R. 124.

On September 26, 1983, Epling's condition was continuing to worsen "with more right leg pain and lower back pain." R. 124. Dr. Faris was unable to obtain ankle reflexes and knee reflexes were poor. R. 124. Epling stated that "he is having frequent giving way of the right leg with falling." *Id*. Dr. Faris prescribed a cane and a prescription for Darvocet. *Id*. R. 124. On October 17, 1983, Epling continued to experience "pain in the lower back radiating to the whole right lower extremity with straight leg raising positive." R. 124. Surgery options were again discussed. R. 124. The addendum to Dr. Faris's October 17, 1983 notes show that an epidural block was performed by a Dr. Ross, but Epling experienced no relief in his condition. R. 124.[10]

---

[9] According to Dr. Faris's January 10, 1983 notes, Epling had a "controverted (sic)" workmen's compensation claim pending, and was told "to return only as necessary." R. 125.
[10] The medical records from Dr. Ross are not part of the present record.

The record reflects that Epling last saw Dr. Faris for treatment on November 28, 1983. R.

123. Dr. Faris's notes reflect the following:

> The patient feels that his condition is getting worse with radiation of
> pain to the right lower extremity, even now radiates to the right side
> of the body and the right arm with numbness and tingling. The
> straight leg raising is slightly positive on the right side, spasm is still
> present. <u>So far, none of the conservative treatment has made any</u>
> <u>significant change. . . . The patient was again advised that there are</u>
> <u>options, but I am not really sure if an operation would help him</u>
> <u>much.</u>

R. 123 (emphasis added).

### **Dr. Griffin**

Epling received treatment from Dr. Taylor Griffin, an orthopedic surgeon, from April 13,

1984 through at least June 23, 1995.[11] Dr. Griffin's initial history on Epling states the following:

> This 40 year old male relates two separate injuries to his back. He
> originally had injured his back on 3/7/80 which he relates occurred
> when he was pulling a drag line. He was working for M.J. Stavola
> Farms in Ocala at that time. He had been seen by a Dr. Seymour
> and states he was out of work approximately three months. He had
> returned to work although has continued to have some intermittent
> problems with his back.
>
> . . .
>
> On 3/25/82 the patient relates that he slipped off the frontend of
> muddy steps on a frontend loader falling approximately six feet. He
> landed on his feet but had marked pain in his lower back. He kept
> working at that time. He relates that even prior to that he had
> received some chiropractic treatment by a Dr. Haling, Chiropractor
> in Ocala. He had returned to see him after the accident. He has
> been out of work since June of 1982. The patient relates that he had
> been treated by Dr. Faris, Orthopedist in Ocala and was admitted to
> the Marion Community Hospital in November of 1982. He
> describes treatment and traction and does relate that he had a
> myelogram performed but does not know the results of his

---

[11] The last record from Dr. Griffin is a June 23, 1995, letter from Dr. Griffin addressed to "Whom it May Concern," and it states that Epling has been under his care from April of 1984 until present. R. 208. It is unknown whether Epling received further treatment from Dr. Griffin after June 23, 1995.

> myelogram. He had continued with outpatient therapy subsequent
> to that. He had an epidural injection with temporary relief for a few
> days. He has continued to have a buckling sensation of his right leg
> and for this had utilized a cane. He has been utilizing a TENS unit
> six hours a day of the last year. The patient currently takes
> approximately four Wygesic tablets a day and Benadryl HS. He
> does relate that surgery had been discussed with him, however,
> apparently he had not elected to proceed with this in the past.

R. 191. Upon initial examination, Epling appeared to be in no severe distress. R. 191. Epling's

lumbar spine showed tenderness at the lumbosacral junction, and he was able to forward flex his

fingertips to the mid-thigh level. R. 190. No definite motor weakness was apparent in the right

leg. R. 190. An x-ray revealed "definite Grade I spondylolisthesis of L5 on S1." R. 190. Dr.

Griffin's medical impressions of Epling's condition on April 13, 1984, reflect the following:

> The patient apparently has been rated at maximum medical
> improvement at some time in the past. . . . I would certainly concur
> that the patient remains disabled from gainful employment at the
> present time due to his spondylolisthesis. . . . I feel that he would
> certainly be a candidate for a lumbosacral fusion in an attempt to
> return him to gainful employment.

R. 190 (emphasis added). On April 27, 1984, after reviewing Epling's prior medical records and

seeing Epling's condition unchanged, Dr. Griffin recommended lumbosacral fusion with dorsal

decompression. R. 189. However, Epling continued to be wary of surgery, stating that his sister

had a fusion and afterwards she was barely able to walk. R. 189. Dr. Griffin's notes state that

"the patient would have a permanent partial impairment of 20% of the body as a whole as a result

of his spondylolisthesis with combined lumbosacral strain." R. 189.

On May 18, 1984, Epling's condition remained unchanged and he stated that sometimes

the pain is so severe that he is unable to get out of bed. R. 188. Dr. Griffin again advised Epling

that, in his opinion, he had reached maximum medical improvement without surgery. R. 188. Dr.

Griffin recommended that Epling "begin some type of vocational training in hopes of obtaining a light job." R. 188.

From July 20, 1984 through August 20, 1984, Epling's condition remained unchanged. R. 187-88. Dr. Griffin arranged for Epling to meet with a Dr. Sypert, a neurosurgeon, at Shands Teaching Hospital in Gainesville, Florida, for a second opinion. R. 187. On October 1, 1984, Epling reported to Dr. Griffin that he had met with Dr. Sypert and his resident who apparently recommended that Epling begin walking four miles a day. R. 187.[12] Epling stated that he had tried to comply with Dr. Sypert's recommendation, but he was unable to walk over a quarter of a mile without his right leg buckling. R. 187. On October 29, 1984, Dr. Griffin's treatment notes reflect the following:

> The patient relates that he has continued to have marked pain. <u>He has apparently been faithful in attempting to progress with exercise program that had been outlined for him by Dr. Sypert at the University of Florida</u>. The patient states however that he is unable to walk one mile daily and his right leg buckles on him every 500-600 feet. He apparently has fallen on the road on several occasions and states that he was in bed for two to three days.

R. 186 (emphasis added). Dr. Griffin encouraged Epling to continue his daily efforts at walking and stretching. R. 186. Epling was sent back to Dr. Sypert for further evaluation. *Id.*

On December 3, 1984, Epling continued to have marked pain in his back and stated "any increase in his activity [causes] exacerbation of his pain." R. 186. Epling reported that he was trying to continue walking, but could only walk about one half block or to the mailbox. R. 186. Dr. Griffin's notes reflect that Epling was attending school once a week in an adult literacy program. R. 186. Dr. Griffin prescribed light physical therapy and Tylenol #3 for pain. R. 185.

---

[12] The record on appeal does not contain any medical records from Shands or Dr. Sypert.

On January 7, 1985, Dr. Griffin's notes show that Epling had attended physical therapy for only four visits and was experiencing marked headaches afterwards. R. 185. Epling stated that he was continuing to try and walk, but he was still limited to a quarter of a mile. R. 185. Epling also stated that he could only stand and sit for a half hour each. *Id*. Dr. Griffin recommended that Epling continue physical therapy, but his notes reflect that Epling was to "[r]emain out of work and recheck in six weeks." R. 185.

Dr. Griffin's March 11, 1985, notes reflect that Epling had been re-evaluated by Dr. Sypert who recommended a lumbar laminectomy with fusion for his spondylolisthesis. R. 184. Epling's condition remained unchanged, and Dr. Griffin advised Epling that "if his pain remains persistent and disabling he would be a candidate for decompressive laminectomy with fusion." R. 184. Dr. Griffin warned Epling, however, that the surgery may not relieve his pain. *Id*. Epling continued to express doubts and concerns regarding the prospects of surgery. R. 183-84.

From June 24, 1985 through July 15, 1985, Epling continued to attend physical therapy, literacy programs, walking, and stretching, but the pain persisted with "increased discomfort with any attempt at increase in activity." R. 183. On August 5, 1985, Epling's wife called Dr. Griffin's office to report that Epling had not been going to physical therapy because it hurt hum too much. R. 183. From August 12, 1985 through September 9, 1985, Epling's condition remained unchanged, but on October 7, 1985, Epling reported to Dr. Griffin that he was experiencing an increase in discomfort. R. 182-81. On October 22, 1985, Epling called Dr. Griffin's office stating that he had "acute and severe exacerbation of pain in his back with radiation from the right posterior sacroiliac area to the knee." R. 181. Upon examination, Dr. Griffin noted "marked subjective tenderness with mild right paravertebral spasm." R. 181. Dr. Griffin sent Epling to

physical therapy with hot packs and ultrasound in an attempt relieve his acute muscle spasm. R. 181. Epling requested a hot tub for symptomatic relief at home. R. 181.

Throughout November of 1985, Epling's condition remained unchanged, but he did receive some temporary relief of pain with physical therapy. R. 180. On November 5, 1985, Epling reported to Dr. Griffin that if he did not improve over the coming months that he would reconsider his decision not to have surgery. R. 180. On November 26, 1985, Dr. Griffin's notes reflect that Epling is to remain out of work. R. 180.

Throughout 1986, Epling's condition remained largely unchanged and Dr. Griffin's notes reflect that "[t]he patient apparently is doing very little activity at home and relates increase in pain with any efforts at further increase in activity." R. 177-79. On October 6, 1986, Epling presented with an injury to his right ankle. R. 176. According to Epling, while walking on a road, his right leg buckled and he fell injuring his ankle. *Id.* On November 17, 1986, Epling continued to have "chronic lower back pain aggravated by increase in activity." R. 175. Epling reported to Dr. Griffin that he was falling regularly, even when walking only short distances. *Id.*

On January 26, 1987, Dr. Griffin's notes again reflect the following:

> I see little evidence in significant change in the patient and feel that he had previously reached his plateau of maximum improvement in April of 1984.

R. 174. On June 26, 1987, Dr. advised that chiropractic treatment for Epling's condition "is not indicated." R. 174. On July 6, 1987, Epling reported severe pain radiating into his left leg. R. 173. Epling stated that he had been in bed for nine days due to the pain. R. 173. Upon examination, Epling was able to stand and ambulate. R. 173. Dr. Griffin's impression was acute lumbar spasm. R. 173. Dr. Griffin also advised Epling that "if he desires chiropractic care, he

will be discharged from care in this office. . . ." R. 173. Epling returned to physical therapy for a course of treatment designed to relieve the acute muscle spasms, including hot packs, medcosonolator, and a trial of electrical stimulation. R. 173. Physical therapy resulted in "minimal relief," but the therapist reported to Dr. Griffin that Epling was poorly motivated. R. 172. Therefore, Dr. Griffin discontinued the therapy on July 15, 1987, "due to lack of benefit and poor motivation." R. 172.

> The patient was advised that I feel his condition remains essentially unchanged. I see minimal changed (sic) from his condition of April of 1984 and would still feel that he has a 20% permanent partial physical impairment related to his spondylolisthesis and chronic lumbosacral strain.

R. 172. On October 19, 1987, Dr. Griffin saw "no change in the patient's status or permanent impairment." R. 172. On December 29, 1987, Epling presented with increased discomfort and he was "walking in a forward flexed position with a marked limp." R. 171. X-rays revealed no change in the L5-S1 spondylolisthesis. R. 171. Epling was not treated again by Dr. Griffin for almost two years. R. 170. However, as set forth below, during Epling's two year absence from Dr. Griffin, Epling sought treatment from Dr. John D. Gaffney.

On January 29, 1990, Epling returned to Dr. Griffin whose notes reflect the following:

> He relates that he has continued to have pain with persistent problems. He was seen by a chiropractor for some time with hotpacks and does have a hot tub at home that he utilizes. He walks around the house. The patient relates that he had a Workmen's Compensation hearing, and, due to his limited education, apparently he had been placed at permanent disability and receives regular checks. He relates that he had not obtained any further orthopedic evaluations or opinions. The patient appears essentially unchanged.

R. 170.  Dr. Griffin reconfirmed his previous diagnosis of spondylolisthesis of the L5-S1.  *Id.*  On July 23, 1990, Epling continued to experience "chronic back pain" with "no relief" from the medication. R. 169.  Epling stated that he was still walking a quarter mile a day.  *Id.*

On January 27, 1992, after another prolonged absence, Epling presented to Dr. Griffin complaining that his condition had gradually worsened.  R. 169.  "He relates that he has intermittent numbness in his right leg and is developing weakness in his left hand."  R. 169. An examination of Epling's left upper extremity revealed "some hypesthesia in the left hand." R. 169.[13]  Epling had swelling without pain, and "mild weakness of grip strength on the left but no evidence of atrophy."  R. 169.  Dr. Griffin's notes also state the following:

> The patient relates that he had been awarded 100% total disability from [Workmen's Compensation Claim].  He apparently does draw $407.00 every two weeks and does have continuing medical payments.

R. 169.  From February 17, 1992 through March 9, 1992, Epling's condition remained unchanged, but the sensation in his left hand had improved and, upon physical examination, Epling was able to forward flex his fingertips to within eighteen inches of the floor.  R. 166-67.[14]  Dr. Griffin's notes show that Epling was also being treated by Dr. John D. Gaffney, a chiropractor.  R. 166.

On April 28, 1993, Epling presented to Dr. Griffin still suffering from chronic low back pain. R. 164.[15]  Epling's forward flexion was just below the knee level, and weakness was present in right hip flexion.  R. 164.  Epling was able to "heel and toe stand," but with some difficulty.  R. 164.  Dr. Griffin's notes show that Epling was able to walk "without a significant limp."  R. 164.

---

[13] Hypesthesia is "[d]iminished sensitivity to stimulation."  *Stedman's Medical Dictionary*, 26th Ed. (1995).

[14] Epling reported to Dr. Griffin that he smoked between one and one half packs of cigarettes a day. R. 167.  Dr. Griffin recommended that he stop smoking and have a chest x-ray.  R. 166.  Epling refused to take the chest x-ray,  R. 166.

[15] Epling was also treated by Dr. Griffin on June 8, 1992, but his condition was unchanged and there was nothing new or remarkable to report.  R. 165.

Dr. Griffin's notes reflect that Epling was suffering from depression.  R. 164.[16]  Dr. Griffin's notes show no change in his opinion of maximum medical improvement from April of 1982.  *Id.*

On October 27, 1993, Epling's condition remained unchanged.  R. 161.  He stated that he can walk only short distances, continues to smoke, experiences "marked pain with even attempts at partial sit ups."  R. 161.  Dr. Griffin's notes show that Epling "still appears to have very little insight or self motivation."  R. 161.  Dr. Griffin's impressions also indicate that Epling suffered from "chronic depression."  R. 161.  Dr. Griffin's final medical record is dated March 1, 1994, and shows no significant changes in Epling's condition.

On May 15, 1994, Dr. Griffin was deposed concerning Epling's application for Social Security disability benefits by Epling's counsel, Patricia K. King, Esq.  R. 131-49.  Dr. Griffin stated that Epling's diagnosis of spondylolisthesis at L5-S1 had persisted since his injuries in the early 1980's.  R. 134.  Dr. Griffin stated that Epling's condition and complaints of pain had been consistent throughout Epling's treatment.  R. 135.  Regarding employment, Dr. Griffin stated that he has "[n]ever been successful in getting [Epling] to return to any type of gainful employment."  R. 135.  Regarding Epling's own description of his symptoms, Dr. Griffin stated the following:

> His pain has been in the lower back or lumbosacral area.  He's subsequently complained of some neck and arm pain but primarily [the] back with radiation to posterior thighs and legs.  He describes the pain as being severe and incapacitating, aggravated by any repetitive bending or lifting type of activity.

R. 135.  Dr. Griffin summarized Epling's physical therapy, treatment modalities, and other attempts to teach him how to live with his pain.  R. 135-36.  Dr. Griffin stated that physical therapy did not provide any significant improvement in Epling's condition or symptoms.  R. 139-

---

[16] Epling reported that he was now smoking three to four packs of cigarettes a day, and when asked by Dr. Griffin why he was not trying to stop smoking, Epling stated that the cigarettes would "'kill him faster.'"  R. 164.

40. Griffin noted that surgery had been offered, but Epling "was very apprehensive about that and elected not to proceed with surgery." R. 136.

When asked whether there were any aggravating factors, other than bending or lifting, which incite or relief pain, Dr. Griffin stated the following:

> Apparently we would expect him to obtain some relief with bedrest, recumbency or stretching exercises. I think he would be restricted from any prolonged walking, climbing, twisting type activity. I do not feel that he could do any manual labor requiring these activities. He would have difficulty with prolonged standing in any one position and certainly would probably need to change positions frequently. . . . I think he could be sedentary or in a seated position, but he relates even significant pain with sitting for prolonged periods of time.

R. 136. Dr. Griffin was also asked whether Epling's statements that he could only walk to the mailbox were consistent with Dr. Griffin's examination. R. 136-37. Dr. Griffin responded stating: "He has been encouraged to increase a walking program over a period of ten years and has never really been able to successfully do that." R. 137. When asked whether Epling had truly given his best efforts at trying to walk more, Dr. Griffin stated: "I feel that he probably limits his activity related to pain." R. 137. "I think he can do more than that, but I think he limits his activity because he feels it causes more pain." R. 137. Dr. Griffin was also asked whether he though Epling was truthful in statements regarding the pain and numbness in his right leg. R. 137. In response, Dr. Griffin stated the following:

> Certainly he did have complaints of pain in his right leg and his calf. He did have a loss of an ankle jerk on the right side. His knee jerks remained intact. His sensation appeared intact, although he did appear to have some give way weakness in the right lower extremity which would appear to have increased from previous evaluations.

R. 137-38.  Dr. Griffin also stated that while the pain medication does control some of Epling's symptoms, it "does not cure his pain."  R. 138.

When asked to describe Epling's gait during December of 1987, Dr. Griffin stated that Epling's gait had remained constant throughout his treatment.  R. 139.  Dr. Griffin described Epling's gait as walking with somewhat of a limp and holding his back in a forward flexed position.  R. 139.  Dr. Griffin stated that Epling had used a cane as a walking aid in the past, but his notes do not indicate the use of a cane on his last office visit.  R. 139.

Dr. Griffin state that throughout Epling's treatment he had "significant limitation of forward flexion, restricting his forward bending to getting his fingertips only to knee level."  R. 141.  However, Epling showed no signs of "definite muscle atrophy or wasting."  R. 141.  Dr. Griffin reported no documented motor sensory abnormalities.  R. 142.  When asked whether Epling has any problems with squatting or rising from a squatting position, Dr. Griffin stated:

> Certainly with his pain I think he would have difficulty in squatting. He has had problems with repetitive bending, lifting, twisting activity.  I think he would be limited in his ability to climb.

R. 142.  Dr. Griffin stated that during examinations Epling was capable of getting on and off the examining table, but complained of pain while doing so.  R. 142.  According to Dr. Griffin, Epling's limitations had not significantly changed during his treatment.  R. 141.

Dr. Griffin was asked a series of questions regarding Epling's ability to sedentary work. R. 143-47.  The questions and Dr. Griffin's answers are as follows:

> Q.   Do you feel that Mr. Epling could . . . sit six hours out of an eight hour workday?  We're not talking about alternating sitting and standing but strictly sitting.
> A.   Certainly by his history over the period of ten years, he's related that he cannot do this.

We would normally expect someone with spondylolisthesis to be able to carry out those activities.

Q.      Do you feel he's being sincere in his statement of inability to do that?

A.      I feel that it does apparently aggravate his pain to sit or even walk for long periods of time.

Q.      So, do you feel that he could stand or walk the remaining two hours if he's saying that he's having problems just walking, well, just walking to the mailbox and back is what he can do?

A.      Certainly I think he probably should have a functional capacity evaluation. <u>His functional limitation certainly is greater than would normally be expected from somebody with this diagnosis.</u>

Q.      Regarding lifting in an eight hour workday ten pounds up to 2.6 hours per day. Do you feel that Mr. Epling could do that?

A.      Certainly with the spondylolisthesis I think the lifting, if he did not have to do any repetitive bending, lifting from waist level or moving it, he could probably lift up to ten pounds. I don't think he could bend or lift it off the floor or lift it overhead.

Q.      Regarding his hand finger action, is there any problem with bilateral manual dexterity?

A.      He's had some complaints of pain in his hand before, but these were unrelated to his workmen's comp injury and had not really been explored.

R. 143-45 (emphasis added). Dr. Griffin was asked to fill out a Residual Functional Capacity ("RFC") evaluation form, but he declined stating the following:

Basically I think he would require a formal function capacity evaluation. The level of work I feel that he possibly could do now would be in the sedentary capacity of this. Whether he could move up to light work would depend on his functional capacity evaluation. Although, his history relates marked restriction of his activities far greater than I would expect from . . . a person who has . . . spondylolisthesis.

R. 145.

Dr. Griffin was asked whether Epling's complaints of chronic pain were consistent with an impairment of concentration as of December of 1987. R. 146. Dr. Griffin stated that because he was not a psychiatrist or psychologist, he was not qualified to answer that question. R. 146.

16

Finally, Dr. Griffin was asked whether there was a possibility that Epling could not do sedentary work. R. 146. Dr. Griffin responded: "It is possible that he would not be able to tolerate it." R. 147.

On August 30, 1994, Dr. Griffin sent a letter to Dorothy Clay Sims, Esq., concerning Epling's depression. R. 160. The letter states that Dr. Griffin believes "that [Epling] does show significant evidence of depression," warranting further evaluation and treatment. R. 160. In a letter dated June 23, 1995, Dr. Griffin provided the following opinion regarding Epling's condition:

> I would like to advise that Mr. Epling has been under my care from April 1984 until the present. He had originally injured his back in 1980. He does have severe spondylolisthesis, L5-S1 with degenerative disc disease, L304, l4-5, and arthritis of his sacroiliac joints. <u>I feel that he is medically disabled from gainful employment and prognosis remains guarded</u>.

R. 208 (emphasis added).

### **<u>Dr. Gaffney</u>**

Epling received treatment from a chiropractor, Dr. John D. Gaffney, from 1988 through at least October 27, 1993. The record on appeal does not contain any contemporaneous treatment notes from Dr. Gaffney, but does contain two letters written on October 27, 1993, on Epling's behalf. R. 128-30. The first letter is directed to the Office of Disability Determination and relates directly to Epling's application for Social Security disability benefits. R. 128. The letter states the following in pertinent part:

> Please find enclosed our latest examination report of Mr. Epling's status. I have known this gentleman since 1988 and have been treating him since that time. <u>He is and has been totally unable to be gainfully employed. He has a very chronic, slowly deteriorating condition that will not get well with passing time.</u> He is extremely

limited in his ability to perform normal activities at home or common daily living activities, let alone any gainful employment. <u>His condition has not changed very much since I first saw him and he continues to be totally disabled.</u>

R. 128 (emphasis added).[17]  In ALJ Calvarese's June 8, 2007, decision finding no disability, Dr. Gaffney's treatment and opinions regarding Epling's condition are not addressed or mentioned even though the ALJ questioned Epling about his treatment with Dr. Gaffney at the May 15, 2007 hearing. R. 212-20, 246.[18]

On October 27, 1993, Dr. Gaffney sent a second letter on Epling's behalf regarding what appears to be a state workmen's compensation claim.  R. 129-30.   In the letter, Dr. Gaffney states the following in pertinent part:

His diagnosis is . . . cervical cranial syndrome, chronic traumatic spondylolisthesis of the L5 with disc derangement. . . . He has extremely limited cervical and dorsolumbar movement.  He is not tolerant of many treatment procedures nor many home activities particularly those that require any bending, working overhead, or looking overhead for any period of time.  He has recurring muscle spasm and positive orthopedic tests.  He has weak cervical, upper extremity and lower back musculature and in general, continues to be moderately impaired.  It is doubtful that this gentleman's overall status will change with passing time and, in fact, it appears to me that he is slowly deteriorating, particularly in his ability to sustain work or do normal physical activity.

R. 129-30.

**<u>Dr. Brodrick</u>**

On March 13, 1995, over six years after his eligibility for disability benefits expired, Epling presented to Dr. Thomas J. Brodrick, an orthopaedic surgeon, complaining of lower back pain.  R. 205.  Epling stated that the pain is present ninety percent of the time and radiates down

---

[17] Again, no examination reports or treatment notes are included in the record on appeal.
[18] Dr. Gaffney's treatment and opinions were addressed in the previous ALJ decisions in this case.  R. 14, 281.

into his right leg.  R. 205.  Epling reported that the pain is exacerbated by physical activities.  R.

205.  Dr. Brodrick's physical exam revealed that Epling ambulates on his heals and toes in a

forward flexion and he has motion of about eighty degrees. R. 205. Epling displayed tenderness in

the lower back and along the sciatic nerve "to some degree."  R. 205.  Epling's hips showed "full

painless range of motion," and his straight leg testing was normal.  R. 205.

Dr. Brodrick took x-rays confirming Grade I spondylolisthesis at the L5-S1 vertebrae and

"some degenerative disk disease."  R. 206.  In his notes, Dr. Brodrick states that spondylolisthesis

"is not the worst thing in the world." R. 206.  Dr. Brodrick offered to inject Epling's back with

cortisone, but Epling declined.  R. 206.  Dr. Brodrick's impressions were as follows:

> I do not think he needs any surgical procedures.  He has no evidence
> of nerve root irritability.   My recommendation would thus be
> possibly some injections, some nonsteroidal anti-inflammatory
> medication and some rehabilitative exercises.

R. 206.  On June 5, 1995, Epling returned to Dr. Brodrick complaining of continued pain in the

lower back.  R. 206.  Epling reported that Tylenol #3 helps his pain.  R. 206.  Dr. Brodrick's

physical findings were consistent with his prior examination.  R. 206.  Dr. Brodrick's impressions

were as follows:

> The same situation persists.  Just take the Tylenol No. 3.  I will see
> him back here in three months.  I have nothing magic to offer this
> man.

R. 207.  The record does not indicate whether Dr. Brodrick treated Epling more than on the two

occasions addressed above.[19]

---

[19] Dr. Brodrick's records do not address the issue of disability.  However, they reflect that Epling's condition persisted.  R. 206-07.

**Dr. Edenfield**

On April 9, 1994, May 12, 1994, and June 4, 1994, Epling was evaluated, at the request of his counsel, by Dr. William H. Edenfield, a board certified psychologist, regarding Epling's application for disability benefits. R. 150. Dr. Edenfield reviewed the following medical records as part of his initial evaluation:

> Reviewed in conjunction with this evaluation were the following medical records: letter dated May 29, 1982, by Dr. Robert Haling; letter dated June 1, 1982, by Dr. Wagdi Faris; hospital discharge report dated November 27, 1982, by Dr. Wagdi Faris; and neurological evaluation report dated September 25, 1984, by Dr. George Sypert.

R. 150. Dr. Edenfield stated that the records were "significant for persistent lower lumbar pains with radicular pattern to right lower extremity. . . . with a 15% permanency, probable herniated lumbar disc with right radiculopathy and a grade spondylolisthesis at L5 and S1, and chronic low back syndrome with a substantial mechanical component related to his spondylolisthesis and bilateral spondylolisthesis." R. 150.

Epling reported to Dr. Edenfield that his pain radiates down through his right leg and his right leg has periodic numbness. R. 150. Epling stated that he is unable to walk for more than a few minutes. R. 150. Dr. Edenfield quotes Epling as stating: "I hate going into stores because I get embarrassed when I fall in public." R. 150. Epling reported having fallen eight or ten times due to weakness in his right leg. R. 150. In addition to the pain in his back and leg, Epling reported headaches occurring a few times a week and lasting for five to six hours. R. 150.

Epling provided a history of his condition dating to the time of the accidents in the early 1980's and acknowledged that he had been told by several doctors that he should have back surgery, but he refused due to fears of complications. R. 151. Regarding the impact of his

condition, Dr. Edenfield quotes Epling as stating that he "feels useless . . . I don't feel like a man anymore. . . . I can't be a father to my children. . . I cannot even play with my children." R. 151.

Dr. Edenfield reviewed Epling's family, social, education, and occupational history. R. 151-52. Dr. Edenfield's review of Epling's daily activities reveals the following in pertinent part:

> [A]rises at approximately 7:00 a.m., after which he makes coffee and watches the morning news on television. After that, he either continues to watch television or try's to walk around his house and yard. The patient states that he [is] unable to walk to the mailbox because he has fallen on several occasions attempting to do so. The patient states that he has fallen eight to ten times in the past six months. . . .

R. 152-53. Dr. Edenfield's mental status examination reveals the following:

> [A] fifty-year-old white male appearing to be somewhat older than his stated age. He is driven to the office by his wife. He is disheveled in his appearance, needs a haircut, has dirty finger nails, and is casually dressed in a thin white cotton T-shirt (underwear type) and a baseball-type cap, which he fails to remove throughout the entire two hour interview. He is initially extremely resistant to being evaluated, his manner is hostile, irritable and aggressive, and using numerous curse words he makes it clear to the examiner that he is "not crazy," and does not need to be seen by a psychologist. It takes almost one half of the two-hour interview to establish rapport with this patient, and thus he has to be asked to return to the office to complete his diagnostic interview. On his return, his manner becomes more friendly and he is more cooperative. His mood is latently depressed, and is masked by irritability, agitation, explosiveness and bravado. His affect ranges from anger to one short episode of weeping. He is extremely embittered toward his doctors, particularly those who have recommended surgery, and very embittered concerning the circumstances of his physical limitations. He exhibits a slight limp favoring his right side, and appears to ambulate with caution. He appears to be in a good deal of discomfort, periodically winces on rotating movements, periodically and spontaneously moves from the sitting position to the standing position (during which time he paces), and demonstrates difficulty in moving between the standing and sitting positions. His attention and concentration are poor, and his immediate and short term memory is impaired. His thought

> processes are slowed, however, fairly-well associated. The content of his thinking is extremely preoccupied with his loss of wage-earner status, bitterness towards his physicians, his inability to provide for his family, his inability to be a "good husband and good father," and a fear of becoming an invalid. His mental grasp is poor, and his insight is impaired. He is convicted to the idea that he is disabled, and is as equally convicted to the idea that the recommended back surgery would leave him in much worse situation that that which he finds himself in at the present time. When asked about symptoms of irritability and explosiveness outside of that which is demonstrated in the office, he becomes evasive and defensive. However, with encouragement of his wife, he reveals that his irritability and explosiveness is the subject of a good deal of marital tension, the patient later indicating that he was "scared" to admit to me that he becomes quite explosive. There is no indication of hallucination nor delusion, by history nor by direct observation. The patient admits to suicidal ideation, which he states occurs once or twice a week. He states that he frequently fantasizes putting a gun in to his mouth and "ending it the easy way." Suicidal planning has not extended beyond that, and the patient denies any previous suicidal attempts.

R. 153-54.

Dr. Edenfield's evaluation included the Millon Clinical Multi-Axial Inventory–II ("the MCMI-II"), the Weschler Adult Intelligence Scale-Revised, the Wide Range Achievement Test-Revised, and the Passage Comprehension subtest of the Woodcock Johnson Test of Achievement-Revised. R. 154. Dr. Edenfield's report notes that the Minnesota Muti-Phasic Personality Inventory-II is the preferred personality test, but the MCMI-II was chosen because it is shorter and would be more appropriate because the questions would have to be read to Epling given his "severe reading deficit." R. 154. Results of the MCMI-II revealed the following:

> [S]uggestive of an individual who is experiencing a severe mental disorder, primarily severe depression with anxiety. Test results are also suggestive for a strong tendency to somatize confined emotions into physical symptoms and/or the exacerbation of existing medical difficulties. These test results are also significant for borderline, dependent and avoidant personality traits. It is also suggestive that,

at least with those upon whom he is dependent, he vents [his] frustrations in a passive-aggressive manner. Finally, test results suggest that the patient is rather schizoid and, from a social standpoint, tends to remain detached and impoverished in his emotional expression. However, when contained frustrations are vented, they are likely to [be] expressed with irritability and explosiveness.

. . .

The National Computer Systems generated report on this patient characterizes this patient as severely depressed and agitated, dependent, demonstrating a marked deficit in social interest, lacking energy, demonstrating minimal activity-seeking behavior, demonstrating impoverished affect, self belittling, irritability and explosive, demonstrating cognitive slippage due to his mental status, demonstrating social withdrawal, engaging in self depreciation, having feelings of unworthiness, possessing thoughts of death, demonstrating distractibility and restlessness, and likely suffering from somatic signs such as muscular pain, headaches, gastro intestinal distress, and/or fatigue.

R. 154-55.

The results of the intelligence testing placed Epling in the "low average" range of intelligence. R. 155. Epling's reading and spelling ability is below a third grade level; his mathematical ability is at a fifth grade level. R. 155. According to Dr. Edenfield, Epling's scores corroborate his impairments in attention and concentration as revealed by the MCMI-II. R. 155.

Dr. Edenfield's findings and recommendations were as follows:

What we are seeing here is a 50-year-old white male who suffers from major depression accompanied by marked anxiety. Considering his long-standing personality tendencies and his bouts with alcohol abuse, prior to 1972, I suspect that he has been suffering from some degree of this depression for many years. I suspect that, other than his previous abuse of alcohol, his primary method of coping with his depression and anxiety was to become "a work aholic," which is confirmed by both the patient and his wife. Unfortunately, it is these kinds of individuals who are most susceptible to depression with the loss of occupational activity and wage-earner status.

. . .

23

With the loss of occupational activity and wage-earner status in June of 1982, the patient also lost his primary coping mechanism for managing [his] pre-existing depression and anxiety.  With the loss of these coping mechanisms, the increase in his depressive symptoms, and with the deterioration in his relationships . . . due to his irritability and explosiveness, the patient has been caught up in a spiral of self-defeating behaviors which has only served to further exacerbate and maintain his depression.  Having strong dependency traits in his personality, the patient generally tends to either "bottle-up" or ineffectively express his emotions. . . . In fact, considering that this patient already suffers from a real musculosketelal (sic) injury, it is highly likely that this somatization is also contributing to the exacerbations and maintenance of his orthopedic pain.

. . .

. . . [T]he patient also has marked to severe impairments in his academic ability, his marked impairments being in reading comprehension and spelling.  With regard to grade-level functioning, his reading and spelling abilities fall somewhere below the third grade level, and his arithmetic ability is about the fifth grade level.  His overall intellectual functioning is at the "low average" range of intelligence, with specific deficits falling into the "mentally retarded" and "borderline mentally retarded" ranges.

. . .

Setting aside this patients orthopedic impairments, which I am not qualified to assess, <u>I believe that this patient has become entrenched into "chronic pain syndrome" since 1982</u>.  I strongly suspect that strong psychological mechanisms . . . and economic mechanisms . . . have served to reinforce this patient's pain, pain behavior, and a strong conviction that he is disabled.  <u>These are psychological mechanisms, tend to be primarily unconscious and are not to be confused with purposeful malingering or exaggeration of symptoms. At this point, these mechanisms are so firmly fixed, and, when coupled with the severe depressive disorder which we are seeing, render this patient totally disabled from a psychological standpoint, alone</u>. . . .

R. 155-56.

On March 17, 1995, Dr. Edenfield, again at the request of Epling's counsel, conducted another evaluation.  R. 193-195.  Dr. Edenfield's diagnosis and impressions remained the same.  R.

193.[20]  The record indicates that Dr. Edenfield evaluations occurred over six sessions.  R. 150-59, 193-204.

**RFC**

On October 28, 1993, a state agency consultant, Dr. Harry L. Collins, Jr., provided Residual Physical Capacity Assessment ("RFC") on Epling.  R. 113-20.  It does not appear that Dr. Collins examined Epling.  R. 218.  According to the RFC, Dr. Collins was not provided any statements from Epling's treating physicians regarding his physical capabilities.  R. 119.  Dr. Collins's evaluation was reviewed by Dr. Michael E. Schoeffel who concurred with Dr. Collin's assessment. R. 120.  The RFC provided by Dr. Collins does not describe what medical records were reviewed during his assessment.  Dr. Collins made a primary diagnosis of spondylolisthesis at the L5-S1 vertebrae, but no secondary diagnosis.  R. 113.  Dr. Collins opined that Epling's condition and symptoms resulted in the following exertional limitations: (1) occasionally lifting and/or carrying a maximum of twenty pounds; (2) frequently lifting and/or carrying a maximum of ten pounds; (3) standing and/or walking a maximum of six hours in an eight hour workday; (4) sitting a maximum of six hours in an eight hour workday; and (5) no limitation in pushing or pulling.  R. 114.  According to the RFC, Dr. Collins based his conclusions on Dr. Griffin's April 28, 1993, treatment notes (R. 162-63) which found: (1) spondylolisthesis of the L5-S1; (2) chronic smoker; (3) depression; (4) marked problems and pain; (5) weakness in the legs if he walks over a quarter of a mile; (6) minimal bending and lifting; (7) negative straight leg test; (8) slight

---

[20] Dr. Edenfield noted that the Epling had been taking his prescribed pain medication with alcohol.  R. 193.

weakness in right hip flexion; and (9) heel and toe standing with difficulty.  R. 114-15.[21]  It is

unknown whether Dr. Collins reviewed any of Epling's other medical records.

Dr. Collins found no postural limitations, no manipulative limitations, no visual

limitations, no communicative limitations, and no environmental limitations.  R. 115-19.  Dr.

Collins did not ascribe any additional limitations regarding Epling's alleged symptoms.  R. 118.

Dr. Collins provided no additional comments in the RFC.  R. 120.  The RFC provided by Dr.

Collins concluded that Epling had the capacity to perform light work.  R. 113-20.  In ALJ

Calvarese's June 8, 2007, decision finding no liability, Dr. Collins's RFC was "given significant

weight" because it was supported by the objective medical evidence.  R. 218.  Notably, Dr. Collins

RFC was the only medical source opinion that was given "significant weight" by ALJ Calvarese.

R. 212-20.

### Florida Workmen's Compensation Claim

In August of 1993, through a mediated settlement agreement, Epling was awarded a lump

sum workmen's compensation payment for the injuries he sustained while working on March 7,

1980 and March 25, 1982.  R. 73-84.  On August 2, 2003, the mediated settlement was approved

by a judge of compensation claims for the State of Florida's Department of Labor and

Employment.  R. 77.  The mediated settlement agreement states that Epling reached maximum

medical improvement on January 10, 1983, with a permanent impairment rating of twenty-five

percent as noted by a report from Dr. Griffin.  R. 79.  The mediated settlement agreement goes on

to state that Epling's employer and insurance carrier "have paid prior benefits to [Epling] in the

---

[21] Dr. Griffin's April 28, 1993, treatment record also notes that there was no change in his opinion that Epling reached maximum medical improvement in the early 1980's and had been awarded "permanent total disability" from a Workmen's Compensation claim.  R. 164.

form of temporary total disability, permanent total disability, wage loss, medical benefits and rehabilitation services." R. 79. Epling's workmen's compensation claim and the settlement agreement are not addressed or mentioned in ALJ Calvarese's June 8, 2007, decision finding no disability.[22]

### Prior Administrative History

As set forth above, Epling filed the present application for disability benefits on September 22, 1993, alleging an onset date of November 4, 1987. R. 58. Epling's eligibility for disability benefits expired on December 31, 1987, and disability must be shown prior to that date. R. 214. On November 3, 1993, Epling's application was initially denied, denied upon reconsideration, and on April 7, 1994, a hearing was requested before an ALJ. R. 62-69. On August 17, 1995, a hearing was held before ALJ Figueroa. R. 32-57. On December 29, 1995, ALJ Figueroa issued a decision denying Epling's application for disability benefits. R. 12-19. On February 14, 1997, Epling appealed the ALJ's decision to the United States District Court for the Middle District of Florida. *Epling v. Apfel*, Case No. 5:97-cv-0038-TC, Doc. No. 1, (M.D. Fla. 1997). On September 21, 1999, the Honorable Timothy J. Corrigan, United States Magistrate Judge, issued an order reversing and remanding the final decision of the Commissioner of Social Security (the "Commissioner"). *Epling v. Apfel*, Case No. 5:97-cv-0038-TC, Doc. No. 29, (M.D. Fla. 1997). Judgment was entered against the Commissioner on the same day. *Epling v. Apfel*, Case No. 5:97-cv-0038-TC, Doc. No. 30, (M.D. Fla. 1997). In the order reversing the final decision of the Commissioner, Judge Corrigan held that the ALJ erred by failing to properly consider Epling's

---

[22] The February 15, 2001, ALJ decision did specifically address Epling's workmen's compensation claim and the settlement agreement. R. 280, 284.

psychological impairments contained within Dr. Edenfield's evaluation when reaching his decision. *Epling v. Apfel*, Case No. 5:97-cv-0038-TC, Doc. No. 29 at 1-3, (M.D. Fla. 1997).

On December 22, 1999, the Appeals Council vacated the prior denial of benefits and remanded the case to the ALJ for further proceedings. R. 212. On February 15, 2001, following a hearing, ALJ Apolo Garcia issued a second decision denying Epling's application for disability benefits. R. 277-288. After the Appeals Council affirmed the ALJ's decision, on June 16, 2003, Epling appealed once more to the United States District Court for the Middle District of Florida. Doc. No. 1. On September 18, 2003, the Commissioner filed an unopposed motion to remand the case back to the Commissioner because the claims file and tape of the February 15, 2001 hearing had been lost and, therefore, the Commissioner could not certify the administrative record. Doc. No. 9. On September 25, 2003, the Honorable Patricia C. Fawsett, United States District Judge, remanded the case under sentence four of 42 U.S.C. § 405(g) for further administrative proceedings. Doc. No. 11. On February 5, 2004, because the Appeals Council could not find the claims file, it remanded the case back to the ALJ for another hearing. R. 261-62. On May 15, 2007, over three years later, a hearing was held before ALJ Calvarese on Epling's 1993 application for disability benefits. R. 221-54.

### May 15, 2007 Hearing

Epling was sixty three years of age at the time of the May 15, 2007, hearing before ALJ Calvarese. R. 221-54. Attorney Pamela Dunmore represented Epling at the hearing. R. 221. A Vocational Expert ("VE"), Robert Bradley also testified at the hearing. R. 221, 248-54. At the hearing, Ms. Dunmore brought Dr. Faris's treatment records and Epling's school records to the attention of the ALJ. R. 226-28. Epling testified that he completed the eighth grade in school and

had to repeat a couple of grades. R. 229. Epling testified that he had a current driver's license since he was fifteen years of age. R. 230. When asked by the ALJ how he was able to secure a driver's license if he could not read, Epling stated that they read the questions to him. R. 230.

Epling testified regarding his prior work experience and the injuries he sustained while working for MJ Stavola Industries. R. 230-31. Epling testified that he tried to go back to work after the second injury, but the other workers would have to carry him to the frontend loader and put him in it. R. 232-33. Epling stated that he was having problems with his back that prevented him from being able to work. R. 233. When asked by the ALJ what was wrong with his back, Epling stated "They said I, I had five cracked vertebras. That's what Dr. Faris said." R. 233. Epling stated the problem was pain. R. 233. When asked by the ALJ how often he experienced pain, Epling responded: "Seem like all the time." R. 233. The ALJ asked if that was still the case, and Epling stated: "More or less." R. 233. The following exchange then occurred:

> Q.     Well, back then in '82, this pain that you were experiencing all the time, if we placed that pain on a scale of one being very little pain, ten being the most amount of pain you could experience, you would have to go to the emergency room, where was your back pain back then?
> A.     Probably seven to nine.

R. 233-34. The ALJ then inquired whether Epling had mentioned his pain to Dr. Faris, and Epling responded that he had told Dr. Faris about the pain. R. 234.[23] Ms. Dunmore inquired about what sort of treatment Dr. Faris provided, and Epling responded that Dr. Faris mainly just prescribed pain pills. R. 234.

Epling testified that walking aggravates his pain, and that back in 1982 he could only walk three to four hundred feet. R. 235. Epling stated that the pain was in the lower back, but the pain

---

[23] Again, the ALJ does not address Dr. Faris or his treatment of Epling in his decision. R. 212-20.

"runs up" to his shoulder bladed.  R. 236.  Epling stated that his right leg "goes out all the time."

R. 236.  When asked to explain what he meant, Epling stated: "I just go down. It don't give me no

warning, you know.  People look at you like you're drunk when you're in the shopping center just

laying there on the floor."  R. 236.  The ALJ asked Epling if he was sure it was the right leg that

he had problems with and Epling stated that he has had trouble with both legs.  R. 236.  The ALJ

asked which leg was giving him problems in November and December of 1987 and Epling

testified that it was his right leg.  R. 236-37.

Epling then testified concerning his daily activities which included watching television and

walking in the house.  R. 237-38.  Ms. Dunmore asked Epling how long he could sit at one time

back in 1987, and Epling testified that he could maybe sit for an hour or half an hour.  R. 238.

Epling then stated: "You know, I don't - - I don't remember.  It's been so long."  R. 238.  After an

hour of sitting, Epling testified that his back would begin bothering him.  R. 238.  Epling stated

that he could only stand in one place for ten to twenty minutes because his legs would go numb.

R. 238.

Epling testified that his only hobby is fishing and in 1987 he would go fishing about every

other Saturday night.  R. 239-40.  Epling stated that he would fish for a couple of hours.  R. 239.

Epling testified that he would bring a lawn chair with him when fishing, but the testimony does

not reveal how long would sit in the lawn chair while fishing.  R. 239. Epling also testified that he

would sit and watch television off and on for two or three hours during the day.  R. 240.  Epling

testified that he would take an hour or two hour nap usually every day to help his back pain.  R.

240.  Epling stated that he had problems sleeping at night due to his pain and he would have to

take medication. R. 241.  Epling stated that in 1987 he would help with some house chores, cook,

and do a little shopping.  R. 241-42.  When asked whether he could vacuum the house, Epling answered: "Most likely."  R. 242.  Epling testified the furthest distance he could drive before having to stop and stretch was fifty to seventy-five miles.  R. 242-43.

Epling testified the heaviest weight he could lift with both hands in 1987 was about ten pounds.  R. 244.  The ALJ asked whether any doctors had given him any kind of lifting restrictions and Epling stated that Dr. Faris restricted his lifting to six to ten pounds.  R. 244. The ALJ then asked Ms. Dunmore if she had anything in writing from Dr. Faris to confirm Epling's testimony, and Ms. Dunmore stated that she did not.  R. 244-45.  The ALJ then stated that the medical records showed that Epling was doing sit-ups and increasing his walking in October of 1987, and the ALJ asked if Epling remembered doing any sit-ups.  R. 246.  Epling testified that he did not remember doing any sit-ups.  R. 246.  Regarding Dr. Griffin's treatment, Epling testified that he was given a lifting restriction of six to ten pounds.  R. 247.

The ALJ then posed a hypothetical question to the VE regarding whether there were any jobs within the regional and national economy that someone with Epling's restriction could perform.  R. 249-53.

> Q.    Let's assume we have an individual who is let's say 44 years of age.  I'm going back to 1987.  Who has completed the . . . eighth grade, but I'm . . . going to go with seventh grade to be on the conservative side here.  And let's assume the person has no ability to read and write. . . . Let's assume that the person has a good ability to use numbers as far as simple, basic math. . . . Let's assume the individual can lift 20 pounds occasionally, 10 pounds frequently, same for carrying, let's assume the person could stand or walk six hours in an eight-hour workday with normal breaks, same for sitting, and no postural limitations, let's see - - no other restrictions.  Now, with those restrictions, would there be any jobs in the regional or national economy such a person could perform, first of all considering past relevant work?

R. 250-51.  The VE testified that someone with those limitations could work as an assembler or hand packer.  R. 252.  The ALJ then asked Ms. Dunmore whether "there are any treating physician restrictions in the file," and she responded that there were no restrictions in the file.  R. 252.  The ALJ then asked the VE to assume that Epling's testimony was fully credible and given his testimony, would there be any jobs in the national or regional economy that such a person could perform.  R. 252.  The VE testified that there would be no such jobs.  When asked to elaborate, the VE stated the following:

> Well, the main thing that stood out to me would be the extent of the back pain.  When they asked to rate his pain on a scale of one to ten, he rated his back pain ranging from seven to nine.  Nine would be, in my opinion, is severe. . . . Also he indicated that he experiences, basically pain in both legs and he emphasized the, the right leg.  He also said that his right leg was weak back in the time that we're concerned with.

R. 253

## **The ALJ's Decision**

On June 8, 2007, the ALJ issued a decision that Epling was not disabled finding the following:

1.  The claimant last met the insured status requirements the Social Security Act on December 31, 1987.

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of November 4, 1987 through his date last insured of December 31, 1987.

3.  Through the date last insured, the claimant has the following severe combination of impairments: spondylolisthesis, Major Depression, and low average intellectual functioning.

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity for light work.

6.  Through the date last insured, the claimant was unable to perform past relevant work.

7.  The claimant was born on September 30, 1943, and was 44 years old, which is defined as younger individual age 18-44 (20 CFR 404.1563), on the date last insured.

8.  The claimant has a limited education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the dated (sic) last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant was not under a disability as defined in the Social Security Act, at any time from November 4, 1987, the alleged onset date, through December 31, 1987, the date last insured.

R. 212-20.  The decision of the ALJ is the final decision of the Commissioner, and on February 19, 2008, the case was reopened in the United States District Court for the Middle District of Florida.  Doc. No. 19. On March 23, 2008, Epling filed a memorandum of law in support of his position on appeal.  Doc. No. 17.  On May 21, 2008, the Commissioner filed a memorandum in support of his decision that Epling was not disabled.  Doc. No. 18.  On October 9, 2008, the Honorable Mary S. Scriven, District Court Judge, entered an order approving the parties' consent to the jurisdiction of the undersigned United States Magistrate Judge.  Doc. No. 20.  The appeal is now ripe for determination.

## II.   THE PARTIES' POSITIONS

Epling assigns two errors to the ALJ.  First, Epling claims that the ALJ erred in failing to properly apply the Eleventh Circuit's pain standard.  Doc. No. 17 at 4-14.  Specifically, Epling argues that ALJ erred by rejecting Epling's credibility regarding the severity of his pain without substantial evidence, and the ALJ erred by requiring objective medical evidence of the severity of Epling's condition and the severity of the limitations caused by pain.  Doc. No. 17 at 14 (citing *Geiger v. Apfel*, Case No. 6:99-cv-12-Orl-18D, 2000 WL 381920 (M.D. Fla. Feb. 9, 2000)).  Second, Epling claims the ALJ erred by failing to give any weight to the Epling's Workmen's Compensation finding of permanent disability. Doc. No. 17 at 16 (citing *Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir. 1984)).[24]  Epling requests that the case be remanded to the Commissioner to properly apply the pain standard and to weigh the Workmen's Compensation finding of permanent disability.  Doc. No. 17 at 16.

The Commissioner argues that substantial evidence supports his decision to deny Epling disability benefits.  The Commissioner maintains that Epling's testimony at the May 15, 2007, hearing regarding his daily activities undermined his subjective allegations of pain.  Doc. No. 18 at 7-8.  Moreover, the Commissioner argues that the objective medical evidence from Dr. Griffin did not demonstrate that Epling's condition could reasonably be expected to produce the incapacitating pain alleged.  Doc. No. 18 at 7.  The Commissioner maintains that Dr. Griffin's statements that Epling was disabled were inconsistent with his own medical record and, thus, properly not afforded controlling weight.  *Id.* at 9.  The Commissioner asserts that the Workmen's

---

[24] In his memorandum of law, Epling requests oral argument.  In the Scheduling Order, the Court stated that it would set oral argument if necessary.  Doc. No. 16.  After reviewing the record on appeal and the parties' briefs, the Court finds oral argument is unnecessary to determine the matters herein.

Compensation decision is non-binding because the decisions from state governmental agencies regarding disability are not binding on the ALJ. Doc. No. 18 at 9-10 (citing 20 C.F.R. § 404.1504). However, the Commissioner acknowledges that Social Security Ruling ("SSR") 06-039, requires an ALJ to explain the consideration given to a state governmental agency's determination. Doc. No. 18 at 10. The Commissioner also acknowledges that the ALJ "did not mention the settlement agreement in his decision." Doc. No. 18 at 11. The Commissioner argues that the ALJ did not commit error because the settlement agreement does not state the impairment rating actually given by the Worker's Compensation Board and, therefore, the agreement provides little insight into the Epling's actual impairment. *Id*.

## III.     <u>LEGAL STANDARDS</u>

### A.     THE ALJ'S FIVE-STEP DISABILITY ANALYSIS

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 CFR §§ 404.1520(a), 416.920(a). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b). Substantial gainful activity ("SGA") is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves performing significant physical or mental activities. 20 CFR §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually performed for pay or profit, whether or not a profit is realized. 20 CFR §§ 404.1572(b), 416.972(b). Generally, if an individual has

earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA. 20 CFR §§ 404.1574, 404.1575, 416.974, 416.975. If an individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical or other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 CFR §§ 404.1521, 416.921.

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588-89 (11th Cir. 1987); *Davis*, 985 F.2d at 534. A remand is required

where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Comm'r*, 265 F.2d 1214, 1219 (11th Cir. 2001). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, it must be determined whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listing(s)"). 20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If the claimant's impairment or combination of impairments meets or medically equals the criteria of a Listing and meets the duration requirement (20 CFR §§ 404.1509, 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the claimant's RFC. 20 CFR §§ 404.1520(e), 416.920(e). An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations secondary to his established impairments. In making this finding, the ALJ must also consider all of the claimant's impairments, including those that may not be severe. 20 CFR §§ 404.1520(e), 404.1545, 416.920(e), 416.945.

Next, the ALJ must determine step four, whether the claimant has the RFC to perform the requirements of his past relevant work. 20 CFR §§ 404.1520(f), 416.920(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.R. § 404.1545(b). The claimant has the burden of proving the existence of a disability as defined by the Social Security

Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA. 20 CFR §§ 404.1560(b), 404.1565, 416.960(b), 416.965. If the claimant has the RFC to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work, the analysis proceeds to the fifth and final step.

At the last step of the sequential evaluation process (20 CFR §§ 404.1520(g), 416.920(g)), the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education and work experience. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. § 404.1567. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and his impairment meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the

RFC, age, education and work experience. 20 CFR §§ 404.1512(g), 404.1560(c), 416.912(g), 416.960(c).

## B. THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision

fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord*, *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636-37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

The district court may remand a case to the Commissioner for a rehearing under sentences four or six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089-92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's RFC); *accord*, *Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work).[25]  In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1) that there is new, non-cumulative evidence; 2) that the evidence is material —  relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090-92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *Keeton v. Dept. of Health & Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).  A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.[26]

---

[25] On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (on remand ALJ required to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (on remand ALJ required to consider the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

[26] With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Id.*  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. *Id.*

## IV. WHETHER THE ALJ ERRED APPLYING THE PAIN STANDARD

Epling argues that substantial evidence, including the opinions and records of his treating physicians, supports his testimony regarding the level of pain he was experiencing on the date he was last insured. Doc. No. 18 at 4. The medical evidence of record described in the ALJ's decision is as follows:

> The claimant was seen by [Dr. Griffin] in April 1984. At that time, he indicated that he had two separate injuries to his back. He had injured his back in March 1980 while pulling a drag line. In March 1982, he injured his back when he slipped and fell. On physical examination, he had a mild-palpable step off with tenderness at the lumbosacral junction. He was able to forward flex. Examination of the lower extremities revealed 1+ knee jerks bilaterally with trace ankle jerk. The clinical impression was spondylolisthesis L5-S1, Grade 1. Dr. Griffin opined that the claimant was disabled from employment. The claimant was recommended to have surgery, which he refused. When he saw the claimant in May 1984, Dr. Griffin indicated that he had reached a plateau of maximum medical improvement. He noted that the claimant should begin some type of vocational training in hopes of obtaining a light job. During follow upon appointments, Dr. Griffin recommended that the claimant increase his ambulation. He was recommended to begin an exercise program. By a follow-up examination in February 1986, Dr. Griffin encouraged the claimant to continue [his] home exercise program and increase ambulation. He noted that the claimant did not make any severe efforts at self-rehabilitation.

R. 214-215. Notably absent from the ALJ's description of Epling's condition and treatment with Dr. Griffin are: Epling's continuous complaints regarding severe pain; radiating pain into his right leg; frequent falling; numbness in this right leg; repeated attempts at physical therapy with no relief of pain and/or exacerbation of the same; and repeated attempts at walking. R. 171-173, 175-76, 181-83, 185-86, 188. The ALJ then described Dr. Griffin's deposition.

> During a deposition in March 1994, Dr. Griffin indicated that when he first examined the claimant in April 1984, he had significant restriction of motion in his lower back. He noted that the claimant's

allegations of functional limitation were far greater than would normally be expected with his diagnosis. He opined that the claimant could lift 10 pounds and could possibly do sedentary work. Dr. Griffin also noted that the claimant was not using a cane despite a definite limp.

R. 215 (emphasis added). The ALJ also addressed Dr. Griffin's June 23, 1995 letter.

Dr. Griffin indicated that the claimant had been under his care since April 1984. He noted that the claimant had originally injured his back in 1980. He stated that he was diagnosed with severe spondylolisthesis, L5-S1 with degenerative disc disease, L3-4, L4-5, and arthritis of the sacroiliac joints. He opined that the claimant was medically disabled from gainful employment and his prognosis remained guarded.

R. 216.

The ALJ described Epling's evaluation by Dr. Edenfield as follows:

The claimant underwent a psychiatric evaluation . . . in June 1994. On mental status examination, the claimant's mood was latently depressed and was masked by irritability, agitation, explosiveness and bravado. His affected (sic) ranged from anger to one short episode of weeping. He was extremely embittered toward his doctors. The claimant exhibited a slight limp favoring his right side and appeared to ambulate with caution. He appeared to be in a good deal of discomfort, periodically winced on rotation movements, periodically and spontaneously moved from the sitting position and demonstrated difficulty in moving between the standing and sitting positions. His attention and concentration were poor and hi immediate and short term memory were impaired. His thought processes were slowed. His mental grasp was poor and his insight was impaired. He was convicted to the idea that he was disabled and was equally convicted to the idea that the recommended back surgery would leave him in a much worse condition than that which he found himself at the time. The claimant admitted to suicidal ideation. The claimant was administered the WAIS-R. He obtained a verbally IQ of 84; a performance IQ of 85; and a full scale IQ of 84, placing him in the "low average;" range of intellectual abilities. The claimant was diagnosed with Major Depression with marked anxiety and a tendency to somatize emotions into physical symptoms; Psychological factors affecting physical illness; Development Disorder, NOS, with severe deficits in reading and

> spelling a marked deficit in arithmetic, Personality Disorder, NOS, with borderline, dependent, passive aggressive, and Schizoid tendencies; and Substance Abuse (pain medication) Disorder, Suspected. Dr. Edenfield assessed the claimant's functional ability to perform simple, repetitive tasks as moderately limited and his ability to perform complex or varied tasks as moderately severe to severely limited. He opined that the claimant's impairment existed within two years of the loss of his wage earner status . . . from 1982 to 1984.

R. 215. Notably absent from the ALJ's description of Epling's evaluation is Dr. Edenfield's ultimate opinion that Epling has been suffering from "chronic pain syndrome" since 1982 which when coupled with Epling's severe depressive disorder, renders him totally disabled from a psychological standpoint alone. R. 155-56.

The ALJ described Epling's treatment by Dr. Brodrick as follows:

> In March 1995, the claimant was seen by [Dr. Brodrick] with complaints of back pain. He indicated that his pain started March 25, 1982 while he was pulling a cable. On physical examination, he was tender in the low back area and tender on the right sciatic nerve to some degree. The clinical impression was Grade I spondylolisthesis, L5-S1. Dr. Brodrick recommended conservative treatment and did not recommend surgical intervention.

R. 215-16.

Before proceeding to step four of the sequential process described above, the ALJ determined that Epling had the RFC to perform light work. R. 216. Part of that process required the ALJ to make a credibility determination regarding Epling's subjective complaints of pain. The ALJ made the following credibility determination:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

R. 217 (emphasis added). The ALJ offered the following explanation for making the above finding:

> The undersigned finds the claimant's allegations regarding his symptoms and limitations not credible to the extent he claims he is precluded from all work activity. The objective medical evidence in the record fails to establish an underlying medical condition that could reasonably be expected to produce incapacitating pain. Despite the claimant's allegations of incapacitating pain, the evidence shows that he only received conservative treatment during the relevant time period. He refused surgery immediately following his injury. When he saw the claimant in May 1984, Dr. Griffin indicated that he had reached a plateau of maximum medical improvement. He noted that the claimant should begin some type of vocational training in hopes of obtaining a light job. During follow-up appointments, Dr. Griffin recommended that the claimant increase his ambulation. He was recommended to begin an exercise program. By a follow-up examination in February 1986, Dr. Griffin again encouraged the claimant to continue [his] home exercise program and increase ambulation. He noted that the claimant did not make any severe efforts at rehabilitation. The claimant was advised on numerous occasions to begin an exercise program to improve his physical condition, but failed to do so. If the claimant had exercised as prescribed, her (sic) condition may have improved. Despite the claimant's depression, the evidence shows that he did not received treatment for any condition. He was evaluated twice by Dr. Edenfield related to his application for disability benefits. He did not otherwise seek mental health intervention. Despite the claimant's allegations of inability to read or write and his diagnosis of low average intelligence, the evidence shows that he has worked performing jobs at the skilled level. This shows a level of adaptability for fairly complex job tasks despite his limited reading and arithmetic ability. Although the undersigned recognizes that he claimant has some degree of limitation, the objective and other evidence simply does not establish that the limitations are as disabling as the claimant alleges.
>
> . . .
>
> The claimant's credibility is further diminished by his inconsistent statements regarding his activities of daily living that include cooking, light household chores, visiting with friends and recreational fishing. Such level of activity is not consistent with a complete inability to work.
>
> . . .

The undersigned considered the medical opinions of record. On several occasions, Dr. Griffin indicated that the claimant was disabled due to his back problems. This assessment is inconsistent with his treatment records of the claimant. Following his injury, he encouraged the claimant to begin vocational rehabilitation so that he could obtain a light job. Additionally, on several occasions, he encouraged the claimant to begin a home exercise plan and increase ambulation. Dr. Griffin also noted that the claimant did not make any severe efforts at self rehabilitation. Further during his deposition in 1994, Dr. Griffin indicated that the claimant could do at least sedentary work. The undersigned also considered the treatment records of Dr. Brodrick. He recommended that the claimant have conservative treatment and did not recommend surgical intervention. <u>Little weight was given the assessment of Dr. Edenfield as the claimant did not seek regular mental heath treatment and only saw him for an evaluation.</u>

. . .

The state agency medical consultant concluded that the claimant had the [RFC] to do light work. <u>This opinion is given significant weight as it is supported by the objective medical evidence.</u>

R. 218 (emphasis added).

In the Eleventh Circuit, subjective complaints of pain are governed by a three-part "pain standard" that applies when a claimant attempts to establish disability through subjective symptoms. By this standard, there must be: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged symptom arising from the condition or (3) evidence that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citing *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)).[27] "20 C.F.R. § 404.1529 provides that once such an impairment is established, all

---

[27] "Medical history and objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw reasonable conclusion about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity." Social Security Ruling 88-13.

evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability." *Foote*, 67 F.3d at 1561; 20 C.F.R. § 404.1529.[28] Thus once the pain standard is satisfied, the issue becomes one of credibility.

A claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability. *Foote*, 67 F.3d at 1561. "If the ALJ decides not to credit a claimant's testimony as to her pain, he must articulate explicit and adequate reasons for doing so." *Id.* at 1561-62. A reviewing court will not disturb a clearly articulated credibility finding <u>with substantial supporting evidence in the record</u>. *Id.* at 1562 (emphasis added). The failure of the ALJ to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *Id.* The lack of a sufficiently explicit credibility finding may give grounds for a remand if the credibility is critical to the outcome of the case. *Id.* If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such

---

[28] Social Security Ruling 96-7p provides: "2. <u>When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established</u>, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.

3. Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." *Id*. (emphasis added).

testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote*, 67 F.3d at 1562 (*quoting Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court)). Thus, where credibility is a determinative factor, the ALJ must explicitly discredit the testimony or the implication must be so clear as to amount to a specific credibility finding. *Foote*, 67 F.3d at 1561; 20 C.F.R. § 404.1529.

In the present case, the ALJ made a specific finding that Epling's "medically determinable impairment <u>could have been reasonably expected to produce the alleged symptoms</u>. . . ." R. 217 (emphasis added).[29] This finding, on its face, meets prongs one and three of the pain standard and thus, the pain standard has been satisfied. *See Geiger v. Apfel*, Case No. 6:99-cv-12-Orl-18D, 2000 WL 381920 (M.D. Fla. Feb. 9, 2000) (holding that an ALJ's finding that a claimant has a medically determinable condition that can produce the symptoms he alleges meets prongs one and three of the pain standard).

Turning to the ALJ's credibility determination, in order for the ALJ to make the finding that Epling's symptoms were not credible he had do several things. First, the ALJ discounted, gave little or no weight to, or failed to mention entirely the opinions of every treating and examining physician that offered an opinion on the issue of whether Epling's symptoms caused him to be disabled.[30] Dr. Gaffney, who treated Epling for at least five years, opined that Epling was "totally unable to be gainfully employed," and had a "very chronic, slowly deteriorating condition that will not get well with passing time." R. 128. As stated above, Dr. Gaffney's

---

[29] The ALJ's decision also contradicts his own specific findings because two sentences after making the above finding the ALJ states: "The objective medical evidence in the record <u>fails to establish an underlying medical condition that could reasonably be expected to produce incapacitating pain</u>." R. 218 (emphasis added)..

[30] *See supra* n. 19.

treatment and opinions are not addressed in the ALJ's decision. Dr. Griffin, who treated Epling for at least eleven years, also opined that Epling was totally disabled. R. 208. However, the ALJ discounted Dr. Griffin's opinion because it was inconsistent with his own treatment records. R. 218. Dr. Edenfield, who examined Epling at least six times and performed two psychiatric evaluations on him, opined that Epling was totally disabled due to chronic pain syndrome and severe depression, both of which Dr. Edenfield stated had existed since 1982. R. 150-59, 193-204. The ALJ gave little weight to Dr. Edenfield's assessment simply because Epling had not sought regular mental health treatment and only saw Dr. Edenfield for an evaluation. R. 218. By contrast, the ALJ afforded significant weight to a non-examining state agency consultant who provided an RFC based on a medical records review. R. 218. Therefore, in order to find Epling's statements regarding the severity of his pain not credible, the ALJ discounted all the medical opinions consistent with Epling's stated symptoms and afforded significant weight to the one opinion inconsistent with Epling's stated symptoms, which was from the only medical professional who had not examined Epling.

The reasons provided by the ALJ for discrediting Epling's testimony regarding the intensity, persistence and limiting effects of his symptoms are not supported by substantial evidence in the record. First, the ALJ appears to discredit Epling's testimony, in part, because Epling was only treated conservatively and never underwent surgery. R. 218. While there is record evidence that surgery was repeatedly offered to Epling throughout the 1980's, the medical record clearly shows that Epling's treating physicians, Drs. Faris and Griffin, both repeatedly expressed significant doubts as to whether surgery would provide Epling any relief from pain. R. 123, 125, 183-84. Moreover, as noted by the ALJ, Dr. Brodrick did not recommend surgery for

Epling. R. 206-07. Thus, to the extent the ALJ determined that Epling's testimony regarding his symptoms was not credible because he had not elected to undergo surgery, that finding is not supported by substantial evidence.

Second, the ALJ finds Epling's testimony regarding his symptoms not credible because Epling was only treated conservatively with physical therapy and home exercise programs, but Epling "did not make any severe efforts at self rehabilitation." R. 218. The record does contain some evidence that Epling was poorly motivated at times and was not always totally compliant with home exercise programs. R. 161, 172. However, the record evidence, including the treatment notes of Drs. Faris and Griffin, and the deposition testimony of Dr. Griffin, overwhelmingly show that Epling continually tried epidurals, physical therapy and ambulating at home, but the conservative treatment provided him with little or no relief from the pain and/or exacerbated the pain, and he frequently fell after walking only short distances. R. 123-24, 126-27, 170, 172-173, 175-81, 183, 185-87. When weighed against the totality of the record evidence, the evidence of Epling's poor motivation and occasional lack of effort or compliance with physical therapy and/or home exercise programs is not such evidence that a reasonable person would accept as adequate to support the conclusion that Epling "did not make any severe effort at rehabilitation." R. 218; *see Foote*, 67 F.3d at 1560 (Substantial evidence is more than a scintilla, it must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.). Thus, the ALJ lacked substantial evidence to conclude that Epling's testimony was not credible because he "did not make any severe effort at rehabilitation." R. 218. Furthermore, the ALJ's statement in support of his credibility determination that "[i]f the claimant had exercised as prescribed, her (sic) condition may have improved," is equally unsupported by

substantial evidence. Every treating and examining physician that addressed the issue of disability,[31] ultimately opined that Epling's condition was unlikely to improve. R. 123-125, 128, 130, 156, 208.[32]

Third, in the section of the ALJ's decision finding Epling's testimony not credible, the ALJ found that despite Epling's depression he had not sought regular treatment for that symptom. R. 218. The ALJ notes that Epling was evaluated by Dr. Edenfield, but affords little weight to Dr. Edenfield's assessment because Epling had not sought regular mental health treatment and only came to Dr. Edenfield for an evaluation. *Id*. The ALJ offers not further explanation for affording little weight to the opinions of Dr. Edenfield. The ALJ's decision to afford little weight to Dr. Edenfield's evaluation is not supported by substantial evidence and is contrary to substantive law. Absent good cause, the opinions of treating or examining physicians must be accorded substantial or considerable weight. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). Moreover, an RFC from a non-examining physician that contradicts the opinions of a treating or examining physician does not establish the good cause required to accord less than considerable weight to such opinions. *See Spencer v. Heckler*, 765 F.2d 1090 (11th Cir. 1985); *Johns v. Bowen*, 821 F.2d 551 (11th Cir. 1987).

> Good cause exists when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."

*Johnson v. Barnhart*, 138 Fed.Appx. 266, 270 (11th Cir. 2005) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004)). There are no other psychological examinations in the

---

[31] *See* supra n. 19.
[32] Indeed, Dr. Griffin terminated physical therapy for Epling due to lack of benefit and motivation. R. 172.

record. Dr. Edenfield's assessment of chronic pain syndrome and severe depression is supported in the treatment notes of Drs. Faris and Griffin, and the opinion of Dr. Gaffney. R. 123-27, 128-30, 160-64. Furthermore, Dr. Edenfield's opinions were based on personal evaluation as well as numerous standardized personality and intelligence tests. R 150-59, 193-204. Dr. Edenfield's opinions are not conclusory or inconsistent with his own medical records. R 150-59, 193-204. Based on the forgoing, the ALJ should have afforded considerable weight to the opinions of Dr. Edenfield, and his failure to do so was error. Epling's subjective complaints of pain, including the lack of any significant relief from conservative treatment and an inability walk beyond the mailbox, are consistent with Dr. Edenfield's assessment. The ALJ's finding that Epling's subjective complaints of pain were not credible is not supported substantial evidence.

Fourth, in the section finding Epling's testimony not credible, the ALJ concludes by noting that the non-examining, state agency consultant found Epling had the RFC to perform light work and that opinion is given significant weight because it is supported by the objective medical evidence. R. 218. "[R]eports of physicians who do not examine the claimant, taken alone, do not constitute substantial evidence on which to base an administrative decision." *Spencer*, 765 F.2d at 1094. While Epling's testimony and subjective complaints of pain are clearly contradicted by the non-examining physician's RFC, that alone is not enough to find his testimony not credible. The ALJ's statement that the RFC is supported by the objective medical evidence is also not accurate because every treating and examining physician who ultimately offered an opinion as to the issue off disability opined that Epling was totally disabled.[33]

---

[33] *See* supra n. 19.

Based on the foregoing, the ALJ's finding that Epling's statements regarding the severity of his pain were not credible was not supported by substantial evidence.

## V.    <u>WHETHER THE ALJ ERRED BY FAILING TO ADDRESS STATE CLAIM</u>

Epling argues that it was also error for the ALJ to fail to consider the state governmental agency finding of disability. Doc. No. 17 at 15-16 (citing *Falcon v. Heckler*, 732 F.2d 827 (11th Cir. 1984). The Commissioner acknowledges that the ALJ did not mention Epling's Workmen's Compensation settlement and the finding therein of total disability. Doc. No. 18 at 10-11. In *Falcon*, the Eleventh Circuit held that an ALJ is required to give "great weight" to the disability findings of a state agency and failure to do so is error. *Falcon*, 732 F.2d at 831. The Court agrees with the Commissioner that the approval by the Florida Department of Labor and Employment of a mediated settlement agreement stating that Epling is totally disabled is different than a direct finding of that agency. However, the ALJ's complete failure to address or mention it is clear error.[34]

## VI.    <u>REMAND</u>

The Court notes that Epling has not requested remand for an award of benefits. Doc. No. 17. However, where the evidence establishes without any doubt that the claimant was disabled, a remand for an award of benefits is appropriate. *See Bowen v. Heckler*, 748 F.2d 629, 631, 636-37 (11th Cir. 1984). With that in mind, the Court has scrutinized the record, reviewed the evidence as a whole, including the opinions of every treating, examining, and non-examining physician, and concludes that the ALJ made errors of law and the final decision of the Commissioner is not supported by substantial evidence. Furthermore, by finding that the ALJ lacked substantial

---

[34] *See* supra n. 22.

evidence to find Epling's subjective complaint's of pain not credible, the Court also concludes that Epling's testimony is consistent with the records of his treating and evaluating physicians. Given the testimony of the VE that if Epling's testimony was credible there would be no jobs he could perform, coupled with the long history of this case, the Court finds that the evidence conclusively establishes that Epling was disabled at the time of the alleged onset date and prior to December 31, 1987. R. 252. Although not requested by Epling, the Court ultimately concludes that this case should be remanded to the Commissioner only for a calculation of an award of benefits. *See Geiger v. Apfel*, Case No. 6:99-cv-12-Orl-18D, 2000 WL 381920 (M.D. Fla. Feb. 9, 2000).

The Court is aware that it is not permitted to decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *See* 42 U.S.C. § 405(g). "Yet within this narrowly circumscribed role, we do not 'act as automatons.'" *Spencer*, 765 F.2d at 1093 (internal citations omitted). Given the long history of the case, the prior remand specifically for proper consideration of Dr. Edenfield's evaluation which as set forth above has not been done, the present ALJ's legal errors and lack of substantial evidence to support a finding that Epling's pain testimony was not credible, as well as the fact that the medical record is unlikely to change, and the testimony of the VE, a remand for a new credibility determination would be inequitable and unjust to Epling. *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982) (remanding for an award of benefits where the claimant suffered an injustice).

## VII.  CONCLUSION

Based on the forgoing, it is hereby **ORDERED** that the case is **REVERSED and REMANDED** to the Commissioner under sentence four of § 405(g) for a calculation for an award of benefits.

**DONE and ORDERED** at Orlando, Florida on March 11, 2009.


GREGORY J. KELLY
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:


N. Albert Bacharach, Jr.
N. Albert Bacharach, Jr., PA
115 Northeast 6th Avenue
Gainesville, Florida    32601

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Brian C. Huberty, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

The Honorable Stephen C. Calvarese
Administrative Law Judge
Office of Disability Adjudication and Review
Desoto Building #400
8880 Freedom Crossing
Jacksonville, FL 32256-1224